**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**SECURITIES AND EXCHANGE COMMISSION,**

                              **Plaintiff,**

        **vs.**                                         **5:15-CV-1166**
                                                        **(MAD/DEP)**

**CHARLES RIEL, III and REINVEST, LLC,**

                              **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**U.S. SECURITIES & EXCHANGE**            **CHRISTOPHER M. CASTANO, ESQ.**
**COMMISSION**                            **GEORGE STEPANIUK, ESQ.**
Brookfield Place, 4th Floor               **PREETHI KRISHNAMURTHY, ESQ.**
200 Vesey Street
New York, New York 10281
Attorneys for Plaintiff

**CHARLES RIEL, III**
8723 Gaskin Road
Clay, New York 13041
Defendant *pro se*

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

        On September 29, 2015, Plaintiff Securities and Exchange Commission ("SEC")

commenced this action alleging that Defendants Charles Riel, III and Reinvest LLC, singly or in

concert, directly or indirectly, violated Section 17(a) of the Securities Act of 1933 (the

"Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act"), 15 U.S.C. § 78j(b); and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.  The

complaint further alleges that Defendant Riel is also liable (i) under Exchange Act Section 20(a),

15 U.S.C. § 78t(a), as a controlling person for Defendant REinvest's violations of Exchange Act Section 10(b) and Rule l0b-5; and (ii) under Securities Act Section 15(b), 15 U.S.C. § 77o(b), and Exchange Act Section 20(e), 15 U.S.C. § 78t(e), for aiding and abetting Defendant Reinvest's violations of Securities Act Section 17(a), Exchange Act Section 10(b) , and Rule 10b-5. *See* Dkt. No. 1 at ¶ 8.

Currently before the Court are the SEC's motion for summary judgment against Defendant Riel and motion for default judgment against Defendant REinvest. *See* Dkt. Nos. 24 & 29.

## II. BACKGROUND

**A.     Defendant Riel's creation and operation of REinvest**

In March of 2008, Defendant Riel formed REinvest as a limited liability company with only one member, himself. *See* Dkt. No. 24-2 at ¶ 1.[1]  REinvest's phone number rang at Defendant Riel's home. *See id.* at ¶ 2.  Other than Defendant Riel, REinvest had no employees, control persons, salespeople, or marketers. *See id.* at ¶ 3.

By at least 2010, Defendant Riel served as the registrant, administrative, technical, and billing contact for www.150percentreturn.com (the "150% Return Website"). *See id.* at ¶¶ 4-5. From at least September 2013 through February 2014, Defendant Riel operated both www.REinvestonline.com (the "REinvest Website") and the 150% Return Website. *See id.* at ¶ 6.  From 2012 through 2014, Defendant Riel had sole authority to take down the 150% Return Website. *See id.* at ¶ 7.  From at least September 2013 through February 2014, the 150% Return Website stated that it was "owned and brought to you by REinvest LLC" and linked to Reinvest's Better Business Bureau webpage. *See id.* at ¶ 8.  The 150% Return Website also represented that

---

[1] Unless otherwise noted, the facts set forth in the background section of this Memorandum-Decision and Order are undisputed.

"150PercentReturn.com and associated . . . domain names are trademarks of REinvest LLC®." *Id.* at ¶ 9.

In 2010, Defendant Riel opened two bank accounts in REinvest's name – REinvest's only bank accounts – at Fulton Savings Bank (the "REinvest Bank Accounts"). *See* Dkt. No. 24-2 at ¶ 11. On one account, Defendant Riel designated himself as the sole authorized signatory, while on the other account he designated himself and his sister as the authorized signatories. *See id.* at ¶¶ 12-13. In practice, Defendant Riel served as the sole signatory on both bank accounts, and his sister merely signed checks when he could not. *See id.* at ¶ 14.

In September of 2010, Defendant Riel opened a futures trading account in Reinvest's name at Rosenthal Collins Group LLC (the "Futures Account").[2] *See id.* at ¶ 15. Defendant Riel had sole authority over the Futures Account. *See id.* at ¶ 16. To open the Futures Account, Defendant Riel claimed on account opening forms that REinvest was a "Commercial . . . Real Estate Developer, Investor and Consultant." *Id.* at ¶ 18. Defendant Riel further claimed that REinvest had annual income of $750,000 to $1,000,000 and a net worth between $1,000,000 and $5,000,000. *See id.* at ¶ 19. Defendant Riel further represented on the Futures Account opening forms that REinvest's liquid net worth consisted of real estate, private investments, and $500,000 of "Cash in Bank." *Id.* at ¶ 20. In reality, the REinvest Bank Accounts, REinvest's only bank accounts, never collectively held more than $54,000. *See id.* at ¶ 21. When opening the Futures Account, Defendant Riel acknowledged his understanding of "[t]he risk of loss in commodity futures trading" and his receipt of a "risk disclosure statement for futures." *Id.* at ¶ 17.

**B.      Offers of a Safe Investment with High Rate of Return**

---

[2] A "futures contract," roughly speaking, "is an agreement for the purchase or sale of a particular commodity for delivery on a fixed date in a future month." *Harry v. Total Gas & Power N.A., Inc.*, ___ F. Supp. 3d ___, 2017 WL 1134851, *2 (S.D.N.Y. Mar. 27, 2017).

***1. The 150% Return Website***

From at least September 2013 through February 2014, the 150% Return Website claimed to offer a "high yield investment" that used a "proprietary method" to provide returns of 50% to 150% over a five-year term "within inherently low risk" and a "built-in safety net process." Dkt. No. 24-2 at ¶ 23. The website further claimed to offer a "highly diversified . . . financial growth vehicle that can bring a consistent double-digit return with a solid, dependable efficiency." *Id.* at ¶ 24. Specifically, the 150% Return Website provided as follows:

> If you're fed up with <u>insultingly low </u>Bank Certificate of Deposit(s), Savings account rates, poorly performing Mutual Funds or any other 'conventional' financial vehicle, <u>you can now do something about it</u>. Maybe you just don't have 20 – 40 years to 'wait and see' if those 'buy and hold' stock picks ever come to fruition…. This may very well be the perfect opportunity for you to move <u>underperforming</u> liquid assets to a highly diversified, proprietary, privatized alternative financial growth vehicle that can bring a consistent double-digit return with a solid, dependable efficiency. You really can do <u>much</u> better for your loved ones, right here, right NOW!

*Id.* (emphasis in original). The website also represented that it had a "proven" investment methodology:

> A proven vehicle that delivers not only diversity, but also a consistently high yield return on your money…. **Our *Proprietary method*** utilizes a series of specific and deliberate actions that are implemented on a very systematic and methodical basis, 'Process verses [sic] out-come'. Typically this privatized method is producing <u>substantially</u> higher yields with an inherently lower risk, than *conventional* H.P. financial investment vehicles.

*Id.* at ¶ 25 (emphasis in original). The 150% Return Website neither explained REinvest's "proprietary" investment method nor mentioned futures trading. *See id.* at ¶¶ 26-27.

The 150% Return Website presented seven investor "testimonials," purportedly from satisfied investors identified by their first names and last initials. *See id.* at ¶ 34. The first

testimonial – dated March 3, 2012, and purportedly from "John and Heather D." in Provo, Utah – claimed as follows: "Together it has taken Heather and me nearly 20 years to realize our first Million. With you, 36 months – painlessly! Need we say more!!" *Id.* at ¶ 35; *see also* Dkt. No. 27-7 at 1. Another testimonial – dated February 5, 2011, and purportedly from "Bethany B." in Sugarland, Texas – claimed as follows: "[T]ime has now shown that you are in fact, the only source that has been producing triple digit results for me." *Id.* at ¶ 36 (emphasis in original); Dkt. No. 27-7 at 1-2. The website included five other purported testimonials from individuals in New York and Pennsylvania. *See id.* at ¶¶ 37-38.

To direct traffic to the 150% Return Website, REinvest advertised on the search engine Google. *See id.* at ¶ 39. The 150% Return Website included a form that viewers could use to email REinvest questions. *See id.* at ¶ 40. REinvest received "numerous brief inquiries . . . from prospective private investors." *Id.* at ¶ 41; *see also* Dkt. No. 27-18 at 1. Defendant Riel then followed up on the inquiries and sent the prospective investors more information. *See id.* at ¶ 42; *see also* Dkt. No. 27-15 at 3.

### 2. The REinvest Website

Defendant Riel's other website, the REinvest Website, implied that REinvest invested in commercial real estate. *See* Dkt. No. 24-2 at ¶ 28. The website claimed that "we are not Real Estate agents or brokers. We are a private business entity . . . [and] have 25+ years of experience and we are looking to buy and or [sic] develop additional Commercial properties." *Id.* at ¶ 29. The REinvest Website invited commercial real estate owners to send REinvest "full details on your property" and claimed that REinvest was interested in "Transactional Funding," "Property Development," "Joint Venture facilitation," and "Selling your property outright." *Id.*; *see also* Dkt. No. 27-9 at 1.

**C.      Money Obtained from Investors**

From 2010 through 2014, the timeframe when REinvest was active, five investors invested $285,000 with REinvest in return for promissory notes from REinvest. *See* Dkt. No. 24-2 at ¶¶ 43, 115-16. Defendant Riel did not tell investors that he would use their investment proceeds for personal purposes. *See id.* at ¶ 44. The SEC, however, contends that Defendant Riel spent most of the funds for his benefit (mainly through checks made out to himself and cash withdrawals), used some of a later investor's funds to repay an earlier investor, and lost almost $30,000 of his investor's funds in trading undisclosed futures contracts. *See id.* at ¶¶ 26-27, 58., 66, 73, 80, 102, 145, 152-55.

*1. Investment by Clara J. Cossey*

On June 30, 2010, Clara Cossey invested her first $50,000 with REinvest, which Defendant Riel deposited into the REinvest Bank Accounts. *See* Dkt. No. 24-2 at ¶¶ 46-47. Before Cossey invested, the REinvest Bank Accounts held no funds. *See id.* at ¶ 48. Over approximately the eight months after Cossey invested, Defendant Riel deposited less than $700 into the REinvest Bank Accounts but drew down the accounts' balance to less than $5,000. *See id.* at ¶ 49. The SEC contends that Defendant Riel used most of Cossey's funds for his own benefit, including writing checks worth $25,000 to himself, making cash withdrawals, and making purchases at retail stores. *See id.* at ¶ 50. Defendant Riel, however, contends that "[t]he majority of the funds drawn out were in fact utilized on legitimate business expenditures." Dkt. No. 36-1 at ¶ 50.

On September 29, 2010, Defendant Riel transferred $15,000 of Cossey's $50,000 investment from the REinvest Bank Accounts to the Futures Account. *See* Dkt. No. 24-2 at ¶ 51.

Over the next five months, Defendant Riel lost over 86% of the money in the Futures Account – $12,932.98 of the $15,000 – through trading losses and fees. *See id.* at ¶ 52.

On March 10, 2011, Cossey invested another $50,000 with REinvest, which Defendant Riel deposited into the REinvest Bank Accounts. *See id.* at ¶¶ 43, 53-54. After this deposit, the REinvest Bank Accounts held $53,737.17. *See id.* at ¶ 55. Over the next three months, Defendant Riel deposited an additional $2,000 into the REinvest Bank Accounts. *See id.* at ¶ 56. By May 31, 2011, Defendant Riel had drawn down the REinvest Bank Accounts to $2,321.11. *See id.* at ¶ 57; Dkt. No. 26-1 at 4. During that time, Defendant Riel wrote checks worth $5,724 to himself, wrote a check for $4,786.34 to his town's tax receiver, wrote a $13,000 check to two non-investor individuals, made cash withdrawals, and made purchases at BJ's Wholesale Club, Overstock.com, and Advance Auto, among other retailers. *See id.* at ¶ 58; Dkt. No. 26-1 at 2-4.

On March 30, 2011, Defendant Riel transferred $10,000 from the REinvest Bank Accounts to the Futures Account. *See id.* at ¶ 59. Within two months, Defendant Riel lost nearly the entire $10,000. *See id.* at ¶¶ 60-61.

On June 1, 2011, Cossey made her third and final investment of $25,000 with REinvest. *See* Dkt. No. 24-2 at ¶¶ 43, 62. The day before Cossey's investment, the REinvest Bank Accounts held less than $2,325. Over roughly the next sixty days, Defendant Riel deposited less than $16.00 into the REinvest Bank Accounts. *See id.* at ¶ 64; Dkt. No. 26-1 at 4-5. During the same period, Defendant Riel drew down the accounts' balance to less than $2,240. *See id.* at ¶ 65. During that time, Defendant Riel made cash withdrawals totaling $18,000, paid the New York State Department of Motor Vehicles, and made purchases at, among other places, Morphy Auctions, Lowes, Overstock.com, Ebay, Inc., and Amazon Market Place. *See id.* at ¶ 66; Dkt. No. 26-1 at 4-5.

On June 14, 2011, Defendant Riel transferred $5,000 from the REinvest Bank Accounts to the Futures Account. *See id.* at ¶ 67. By the end of June 2011, $3,113.98 remained in the Futures Account. *See id.* at ¶¶ 68-70. After June 2011, Defendant Riel stopped trading in and transferring funds to the Futures Account. *See id.* at ¶ 71. Eventually, Defendant Riel transferred the approximately $3,000 then remaining in the Futures Account to the REinvest Bank Accounts. *See id.* at ¶ 72. In total, Defendant Riel lost nearly 90% of the $30,000 he transferred to the Futures Account from Cossey's investments. *See id.* at ¶ 73.

### 2. Investment by William Villatore

In October of 2012, William Villatore invested $75,000 with REinvest through a $50,000 check and $25,000 wire transfer. *See* Dkt. No. 24-2 at ¶¶ 43, 74-75; Dkt. No. 26-1 at 12-13. Before Villatore's first investment reached the REinvest Bank Accounts, the accounts held less than $750.00. *See id.* at ¶ 76. In the month preceding Villatore's investments, the accounts had incurred several "insufficient funds charges" while carrying a negative balance. *See id.* at ¶ 77. Over the next three months, Defendant Riel deposited only $60.00 into the REinvest Bank Accounts. *See id.* at ¶ 78. Also during that time, Defendant Riel made cash withdrawals (mostly through checks made out to cash) totaling $46,600.00, wrote two checks to himself totaling $18,100.00, and made purchases at, among other places, Staples, JC Penney.com, and Ebay, Inc. *See id.* at ¶ 80; Dkt. No. 26-1 at 12-14.

### 3. Investment by Ted Tutor

In February of 2013, Ted Tutor, a Tennessee retiree who had previously worked as a state probation officer and social worker, found one of REinvest's websites when he searched for "high-yield investments" on the Internet. *See* Dkt. No. 24-2 at ¶ 81. Tutor became interested in investing with REinvest "based on the website's representations of a 150% return on investment

over a fixed time period." Dkt. No. 28 at ¶ 3. After reviewing the REinvest website, Tutor

contacted Defendant Riel for more information. *See id.* at ¶ 4. According to Tutor, Defendant

Riel told him, among other things, that "REinvest was in the business of marketing short-term

loans to the real estate industry in exchange for a high-interest rate of return, which he claimed

his family had successfully done for many years." *Id.* at ¶ 5. Tutor also claims that Defendant

Riel told him that his investment proceeds would be used for Reinvest's business and that

Defendant Riel "promised me a 150% return on my REinvest investment – or 37.5% per year,

over a 48-month (four-year) term." *Id.*

After several discussions with Defendant Riel, Tutor invested $25,000.00 with REinvest

at the end of February 2013. *See* Dkt. No. 24-2 at ¶ 87. Tutor signed and had notarized

REinvest's Performance Contract and Agreement (the "Original Tutor Agreement") and returned

it to Defendant Riel, who then signed it himself in a notary's presence. *See id.* at ¶ 89. The

Original Tutor Agreement referred to Tutor as a "Private Investment Lender" and referred to

Tutor's investment as "Investment Loan Funds." *Id.* at ¶ 90. This agreement, accompanied by a

promissory note, represented that REinvest would provide a "**Return on Investment**" of 150%

over 48 months, or "37.5% annualized." *Id.* at ¶ 91. Under the terms of the agreement, REinvest

"guaranteed" the return of Tutor's principal but not the interest. *See id.* at ¶ 92. Defendant Riel

also signed and had notarized a $25,000.00 promissory note reflecting that REinvest would owe

Tutor the projected total of $62,500.00, which represented the entire principal amount plus

interest after four years. *See id.* at ¶ 93; Dkt. No. 28-3 at 4.

Immediately prior to Tutor's $25,000.00 investment, the REinvest Bank Accounts held a

balance of $1,121.51. *See id.* at ¶ 99; Dkt. No. 26-1 at 16. During the four months following

Tutor's investment, Defendant Riel deposited less than $1,500.00 into the accounts but drew

down the REinvest Bank Accounts' balance to $561.88. *See id.* at ¶¶ 100-101; Dkt. No. 26-1 at 16-19. During this time, Defendant Riel wrote two checks out to cash totaling $20,027.00, wrote one check to himself totaling $3,000.00, and, among other things, wrote several small checks to various charities. *See id.* at ¶ 102; Dkt. No. 26-1 at 16-19.

On April 1, 2014, about a year after Tutor invested with REinvest, Defendant Riel emailed Tutor an "Activity Statement." Dkt. No. 24-2 at ¶ 103; Dkt. No. 28-1 at 1-2. Reinvest's logo and a thirteen-digit alphanumeric "CLIENT ACCT NO." appeared at the top of the statement. *See id.* at ¶ 104; Dkt. No. 28-1 at 2. The statement showed a $25,000.00 principal amount, a term of 48 months, and claimed a "Term R.O.I. Rate" of 150%. *See id.* at ¶ 105; Dkt. No. 28-1 at 2. The activity statement purported to show a monthly "activity earnings addition" of $616.50 as of March 31, 2013, and then amounts ranging from $744.92 to $796.27 at the end of each month from April 2013 through February 2014. *See id.* at ¶ 106; Dkt. No. 28-1 at 2. At the bottom, the activity statement purported to show a "PRELIMINERY [sic] YTD P/L" of $9,245.29." *Id.* Tutor understood this to be his "investment return" for the year. *See id.* at ¶ 107; Dkt. No. 28 at ¶ 11. However, by March 21, 2014, the REinvest Bank Accounts held only $436.53. *See* Dkt. No. 26-1 at 26.

### 4. Investments by James Singleton

On May 15, 2013, Defendant Riel emailed James Singleton, a resident of Jacksonville, Florida, and thanked him for visiting the 150% Return Website. *See* Dkt. No. 24-2 at ¶ 109. In his email to Singleton, Defendant Riel attached a "Non Disclosure – Confidentiality Agreement." *Id.* at ¶ 110. The agreement contained the following language:

> No potential private investor(s), or their representative shall
> conduct any site visits or initiate any contact with any of the
> following that may apply to any particular transaction and[/]or
> targeted asset which may be disclosed; *network member, owner,*

> *tenants, property manager, liquidator, broker, attorney, and/or*
> *assigned representative(s)* without obtaining the prior written
> consent directly from REinvest LLC®, and[/]or Chuck Riel.

Dkt. No. 24-2 at ¶ 110; Dkt. No. 27-10 at 5 (emphasis in original).

On June 4, 2013, Defendant Riel emailed Singleton "commitment documentation,"

including a Performance Contract and Agreement (the "Original Singleton Agreement"), and

asked Singleton to return the signed documents. *See id.* at ¶ 112. Like the Original Tutor

Agreement, the Original Singleton Agreement referred to Singleton as a "Private Investment

Lender," to his investment as "Investment Loan Funds," and to the 150% rate of return as "Return

on Investment." *Id.* at ¶¶ 90-91, 113; Dkt. No. 27-12 at 4. Singleton's agreement had a longer

investment period than Tutor's: the agreement represented that REinvest's "projected rate of

return" was 150% over a 60-month term, or "30% annualized," rather than Tutor's 48-month

term. *See id.* at ¶¶ 91, 114.

On June 12, 2013, Singleton invested $25,000.00 with REinvest. *See* Dkt. No. 24-2 at ¶

115. Before the funds reached the REinvest Bank Accounts, the accounts held $561.88. *See*

*id.* at ¶ 117; Dkt. No. 26-1 at 19.

On June 17, 2013, Defendant Riel emailed Singleton an "Opening Statement" that

contained REinvest's logo and a thirteen-digit client account number. *See id.* at ¶¶ 118-19; Dkt.

No. 27-14 at 2. The "Opening Statement" also provided the following information about

REinvest:

> Due to our Record breaking business in 2012, we now have most of
> our 2013 projected openings filled! This was accomplished by
> accepting Pre-commitment (LOI) agreements from existing client-
> partners, their relatives, friends and associates.
>
> It is for this reason, that we now have an EXTREMELY Limited
> number of available openings. . . . Please be well advised that we

> anticipate having all of our 2013 projected openings filled very shortly.
>
> Any of you that would like to get in on our very limited remaining offerings for the 2013 Calendar year, please do not delay in communicating your interest now, as any available openings are strictly on a first-come, first-served basis only.

Dkt. No. 27-14 at 2 (emphasis in original).

Between the date when Singleton invested on June 12, 2013 to July 23, 2013, the REinvest Bank Accounts balance fell to $1,047.62. *See* Dkt. No. 26-1 at 20. During this time, Defendant Riel, among other things, wrote a check to himself for $5,500.00 and withdrew $18,750.00 in cash. *See id.* at 19-20.

On August 1, 2013, Defendant Riel emailed Singleton a "monthly activity statement." Dkt. No. 24-2 at ¶ 125. The monthly statement bore REinvest's logo and a client account number at the top. *See id.* at ¶ 126. The statement purported to show that in July 2013, Singleton had earned $616.46 on his $25,000.00 investment; a monthly rate of return of 2.5%, or 30% annually. *See id.* at ¶ 127. The statement also purported to show that Singleton had earned a "PRELIMINERY [sic] YTD P/L" of $862.95. *See id.* at ¶ 128. The statement also contained language identical to the opening confirmation statement's language encouraging Singleton to invest again. *See id.* at ¶ 129.

On August 5, 2013, Defendant Riel emailed Singleton in response to a query about investing more with REinvest. *See* Dkt. No. 24-2 at ¶ 130. In his email, Defendant Riel stated as follows:

> Per your request, I have checked on the $25,000 – with monthly payout availability. We very seldom have anything under $100k in our network these days, so as I suspected, that particular amount is not available. However, as of today, we do a [sic] $40,000 @ 5% with Monthly payout of $166.67, and a $50,000 @ 6% with a monthly payout of $250.00. These are 5 year terms.  * We also do

> have available a $50,000 @ 30% / 5 year Term – no monthly
> payout.

*Id.* at ¶ 130; Dkt. No. 27-21 at 1. On August 28, 2013, Defendant Riel emailed Singleton again,

informing him that "[w]e now have ONE opening available as follows: US $45,000.00 @ 160%

Return on a 60 Month Term. As I'm sure you'll agree, this specific opening offers a very healthy

return. And I'm sure it will not be available for long." *Id.* at ¶ 131; Dkt. No. 27-22 at 1. Two

days later, Defendant Riel sent Singleton another email about two additional investment

opportunities. *See id.* at ¶ 132; Dkt. No. 27-23 at 1. From August 5, 2013 through August 30,

2013, the REinvest Bank Accounts never held more than $1,300.00. *See id.* at ¶ 133; Dkt. No.

26-1 at 21.

On October 8, 2013, Defendant Riel emailed Singleton a REinvest non-disclosure

agreement covering information provided to Singleton about "specific High Yield private

financial growth vehicles" and referring to Singleton as a "potential private investor." *Id.* at ¶¶

135, 139. On October 11, 2013, Singleton wrote a check for $25,000.00 to REinvest, which was

deposited on October 15, 2013. *See id.* at ¶¶ 140-41; Dkt. No. 26-1 at 22. Immediately prior to

receiving Singleton's check, the REinvest Bank Accounts held less than $2,650.00. *See id.* at ¶

142. By January 30, 2014, the REinvest Bank Accounts' balance had turned negative. *See id.* at

¶ 143; Dkt. No. 26-1 at 25. During this time, Defendant Riel made a repayment of $18,750.00 to

Cossey, REinvest's first investor, wrote three checks to himself totaling $7,060.40, and made

withdrawals from an ATM totaling $1,000.00. *See id.* at ¶¶ 43, 45-46, 53, 62, 145; Dkt. No. 26-1

at 22-25.

From December 2013 through February 2014, Defendant Riel continued to solicit

additional investments from Singleton by email, including for a "[t]ax shelter." *Id.* at ¶¶ 146-47.

On March 1, 2014, Defendant Riel emailed Singleton two more account statements, one for each

of Singleton's two REinvest investments.  *See id.* at ¶ 148.  The statement for Singleton's first

investment purported to show that Singleton had earned monthly returns that, when annualized,

equaled a 30% rate of return.  *See id.* at ¶ 149.  The statement for Singleton's second investment

purported to show monthly returns that, when annualized, ranged from 18.4% to 30.5%.  *See*

*id.* at ¶ 150.

### 5. *Investment by Robert Weinberg*

In September 2013 – between Singleton's first and second investments – Robert Weinberg

invested $10,000.00 with REinvest.  *See* Dkt. No. 24-2 at ¶ 151.  Immediately prior to receiving

Weinberg's funds on September 26, 2013, the REinvest Bank Accounts held less than $65.00 and

received an "insufficient funds charge" from the bank.  *See id.* at ¶ 152; Dkt. No. 26-1 at 22.  On

September 27, 2013, Defendant Riel withdrew $800.00 in cash from the accounts.  *See id.* at ¶

154.  On September 30, 2013, Defendant Riel wrote himself a check for $6,000.00 from the

REinvest Bank Accounts.  *See id.* at ¶ 154; Dkt. No. 26-1 at 22.  Between the time Weinberg's

investment reached the REinvest Bank Accounts and Singleton's second investment, Defendant

Riel deposited no funds into the accounts.  *See id.* at ¶ 155.

## D.    The SEC's Investigation

In January 2014, the SEC served REinvest, through Defendant Riel, with an investigative

subpoena for documents.  *See* Dkt. No. 24-2 at ¶ 164.  Approximately two weeks later, the SEC

served Riel with an investigative subpoena for documents and testimony.  *See id.* at ¶ 165.  Both

Riel and REinvest failed to comply with the subpoenas.  *See id.* at ¶ 166.

On March 13, 2014, the SEC filed an application in the United States District Court for

the Southern District of New York for an order requiring Riel and REinvest to comply with the

subpoenas.  *See id.* at ¶ 167.  On March 28, 2014, Riel appeared in court for a show-cause

hearing. *See id.* at ¶ 168.  At the hearing, Riel claimed that "[t]his whole thing is a concern over five – five – private loan arrangements" and that REinvest "never had anything to do with any kind of a financial security." *Id.* at ¶ 169.  On march 31, 2014, the court ordered Riel and REinvest to produce responsive documents and ordered Riel to appear before the SEC for sworn testimony on May 1, 2014.  *See id.* at ¶ 170.

On April 7, 2014 – one week after the court's subpoena enforcement order – Defendant Riel sent Tutor a letter on REinvest letterhead.  *See* Dkt. No. 24-2 at ¶ 171; Dkt. No. 28-2 at 1. Defendant Riel's letter instructed Tutor to "[p]lease discard/delete any documents received prior to today's date, as previous documents contained errors.  The documents you received today, have been CORRECTED."  Dkt. No. 28-2 at 1 (emphasis in original).  The letter enclosed documents ti characterized as "complete REVISIONS" and stated as follows: "In an effort to *safe-guard* your financial interest in this time of turbulence, the revisions are being done so that these document[s] more clearly define our relationship and transaction(s) as a private-loan arrangement, rather than having anything to do with the 'financial securities' industry." *Id.* (emphasis in original); *see also* Dkt. No. 24-2 at ¶ 174.  The revised Performance Contract and Agreement attached to the letter (the "Revised Tutor Agreement") was nearly identical to the Original Tutor Agreement.  *See* Dkt. No. 24-2 at ¶ 175.  The two agreements differed in one respect: the Original Tutor Agreement referred to Tutor as a "Private Investment Lender" and to Tutor's funds as an "investment," while the Revised Tutor Agreement referred to Tutor as a "Private Lender" and to the funds as a "private loan." *Id.* at ¶ 176.[3]

---

[3] Defendant Riel insists that these changes "had absolutely NO effect on terms or conditions of loan agreement."  Dkt. No. 36-1 at ¶ 176.

Defendant Riel's letter also provided the following instructions to Tutor "if/when anyone from the SEC contacts you:"

1. I would not recommend that you disclose any information, but that you simply confirm what I/we will have already given them. They will receive no more information from me other than the following documents; "Performance Contract and Agreement(s)," "PROMISSORY NOTE(S)" and the "CONTRACT/AGREEMENT ACKNOWLEDGMENT(S)".

2. I would not recommend that you disclose your monthly statements, as I can see them very easily making a comparison to a typical *"financial Security"* procedure, which obviously we do NOT want to happen.

3. Obviously it is critical that you have the <u>exact same</u> documentation in your possession that I will be showing the SEC as per their demand. So we need to be absolutely clear and in agreement on these revisions.

Dkt. No. 28-2 at 1 (emphasis in original); Dkt. No. 24-2 at ¶ 177.

On April 15, 2014, after he had sent his April 7 letter to Tutor instructing him to "discard/delete" documents and at least five monthly statements to Tutor and Singleton, Defendant Riel responded by letter to the SEC's investigative letter. *See* Dkt. No. 24-2 at ¶¶ 179-180. Defendant Riel's letter claimed that "there is no correspondence anywhere pertaining to past or present participants [in the '150Percent Return project'] other than the actual written contract(s)/Agreement(s) which copies are enclosed." *Id.* at ¶ 180; Dkt. No. 27-19 at 1.

On May 1, 2014, Defendant Riel testified under oath before the SEC. *See id.* at ¶ 181. During his testimony, Defendant Riel selectively asserted his Fifth Amendment privilege. *See id.* at ¶ 182. When asked whether he had communicated with any of the investors, or "note holders," by email or regular mail since January 2014, Defendant Riel twice denied having done

so. *See id.* at ¶ 183; Dkt. No. 27-15 at 4, 9. However, Defendant Riel did admit that he spoke with some of the investors by phone. *See* Dkt. No. 27-15 at 9.

In approximately April or May 2014, Defendant Riel asked Tutor to sign a "clarification statement." Dkt. No. 24-2 at ¶ 184. Riel claimed that the other REinvest investors had signed the statement and that it would be "helpful" for Tutor to sign it. *See id.* at ¶ 185. Defendant Riel claimed that he had "carte blanche" to use Tutor's investment funds as Riel saw fit. *See id.* at ¶ 186. Tutor claims that, upon Defendant Riel claiming that he had "carte blanche," he became concerned and "informed Mr. Riel that that was not the case and that I had made an investment in REinvest, not a personal investment or loan to him." Dkt. No. 28 at ¶ 14. Despite his concerns about the "clarification statement," on May 7, 2014, Tutor signed the document in hopes of salvaging his investment and getting his money back. *See id.* The clarification also provided that REinvest or Riel could use Tutor's funds for "any personal and or private use" and that the 150% Return Website had no effect on Tutor's decision to provide funds to REinvest. *See* Dkt. No. 24-2 at ¶ 189; Dkt. No. 28-4 at 1.

On May 5, 2014, Defendant Riel emailed Singleton and asked him to sign a clarification statement with the same language as he provided to Tutor. *See* Dkt. No. 24-2 at ¶ 190. Defendant Riel accompanied his email with a five-page letter. *See id.* at ¶ 191. Defendant Riel's letter referred to Singleton's funds as "the private-loan (which you're utilizing as an alternative investment vehicle for yourself)." *Id.* at ¶ 192; Dkt. No. 27-30 at 1. The letter admitted that the SEC staff had shown Riel photocopies of checks from "the business account" made out to himself "to take care of expenses," to "different charities," and to "the person/company who had done some property repair/maintenance." *Id.* at ¶ 193; Dkt. No. 27-30 at 3. Defendant Riel further claimed as follows: "I am a small privately held company, sometimes it is just simpler to take

money at times from one area, or another and make any adjustment elsewhere.  It all evens out in the end. . . .  Obviously it would be helpful if you would be willing to sign a statement for me that simply confirms that you as the private-lender are not concerned with the utilization of the funds."  *Id.* at ¶ 194; Dkt. No. 27-30 at 3.  Riel's letter instructed Singleton that "[o]ur private business by and between you and me, is just that — PRIVATE.  This regulatory agency cannot legally make you disclose anything.  In a worst case scenario, they can legally compel you to respond to them.  THEY CANNOT MAKE YOU TALK TO THEM ON THE PHONE."  Dkt. No. 27-30 at 4.

Two days later, on May 7, 2014, Defendant Riel again emailed Singleton and asked him to sign the clarification statement.  *See* Dkt. No. 24-2 at ¶ 196; Dkt. No. 27-31.  In that email, Defendant Riel stated as follows: "[I]n order for me to do everything in my power to protect your interest, I do need to count on your cooperation."  *Id.* at ¶ 197.

On May 9, 2014, Defendant Riel sent Singleton a letter following their telephone conversation.  *See id.* at ¶ 198.  In that letter, Riel conceded that Singleton had made "a Private Investment Loan:"

> With respect to our brief phone conversation yesterday, with the current SEC issue, it is understandable that you may have become *uncertain* about your position and your decision to trust in me as you have. . . .  We are not (nor do we purport to be) a registered broker-dealer, transfer agent, investment adviser, investment company, or offer, buying or selling of any typical financial securities.  What we offer is an "*alternative*" to all of the above stated.  In fact, our *alternative* financial opportunity is a Private Investment Loan.  It is very simply a private-loan arrangement being utilized as an *alternative* private investment vehicle.

Dkt. No. 27-32 at 1 (emphasis in original).  Again, Defendant Riel indicated he needed to "count on [Singleton's] cooperation" to protect his interests.  *See id.*

**E.      Defendant Riel's Deposition**

On September 29, 2015, the SEC filed its complaint against Riel and REinvest. *See* Dkt. No. 1. On June 8, 2016, Defendant Riel appeared for his deposition and asserted his Fifth Amendment privilege in response to all substantive questions. *See* Dkt. No. 24-2 at ¶¶ 202-03; Dkt. No. 27-16.

## III. DISCUSSION

### A.    Summary Judgment Motion Against Defendant Riel

The SEC's first and third causes of action assert securities fraud claims against Defendant Riel under Section 17(a) of the Securities Act based on two liability theories: primary violations of Section 17(a) and aiding and abetting Reinvest's violations of Section 17(a). *See* Dkt. No. 1 at ¶¶ 105-07, 111-14. Similarly, the SEC's second, fourth and fifth causes of action allege securities fraud claims against Defendant Riel under Exchange Act Section 10(b) and Rule 10b-5 based on three liability theories: (1) primary violations, (2) aiding and abetting Reinvest's violations, and (3) control person liability for Reinvest's violations of Section 10(b) and Rule 10b-5. *See id.* at ¶¶ 108-10, 115-22.

### *1. Summary Judgment Standard*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### 2. Fifth Amendment Privilege

In total, Defendant Riel disputed fourteen statements set forth in the SEC's statement of material facts. *See* Dkt. No. 24-2 at ¶¶ 58, 66, 80, 84-86, 102, 124, 156-158, 187, 197, 200. Since these statements all involve facts within Defendant Riel's personal knowledge, generally he would be permitted to rely on assertions in a self-serving declaration to support the denial. Having chosen to assert his Fifth Amendment privilege in this proceeding, Defendant Riel cannot now rely on such statements to oppose the SEC's motion for summary judgment. *See S.E.C. v. Nadel*, 97 F. Supp. 3d 117, 124-25 (E.D.N.Y. 2015) (striking the defendant's declaration where he had invoked his Fifth Amendment privilege in discovery and granting the SEC's motion for summary judgment).

In his response to Plaintiff's motion, Defendant Riel repeatedly claims that he did not know the consequences of asserting his Fifth Amendment privilege because he has been proceeding *pro se*. *See* Dkt. No. 36 at 5, 6, 9 ("I was NEVER advised that by asserting my Fifth Amendment privilege that I would be giving up my God given Rights through the Constitution of

the United States of America").  In his deposition in this matter, however, Defendant Riel acknowledges that he had retained criminal defense counsel for the SEC's criminal investigation. *See* Dkt. No. 27-16 at 3.  Further, he acknowledges that he had the opportunity to speak with criminal defense counsel about his deposition in this matter.  *See id.*  Additionally, during his deposition, counsel for the SEC warned Defendant Riel as follows: "Sir, are you aware that if you assert your Fifth Amendment privilege today, an adverse inference could be drawn against you by a judge or a jury in this civil litigation?"  *See id.*; *see also* Dkt. No. 27-15 at 6 ("You should be aware that if you refuse to answer a question based on your Fifth Amendment privilege, a judge or a jury may, may, Mr. Riel, take an adverse inference against you in a civil action that the SEC may determine to bring against you.  That means that the judge or jury would be permitted to infer that your answer to the question would have tended to incriminate you").

"[A] party who asserts the privilege against self-incrimination must bear the consequences of lack of evidence, . . . and the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation."  *United States v. Certain Real Property & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995) (internal quotation marks and citations omitted).  Defendant Riel was warned of the consequences of invoking his Fifth Amendment privilege and knowingly chose to do so.  Having knowingly made that decision, Defendant Riel cannot now rely on unverified, self-serving statements "as a sword to resist summary judgment, especially where [he] claimed the Fifth Amendment's protections as a shield to avoid submitting [himself] to questioning on the substantive issues addressed by the pleadings."  *In re Livent, Inc., Noteholders Sec. Litig.*, 355 F. Supp. 2d 722, 734-35 (S.D.N.Y. 2005).

In any event, even when the Court considers Defendant Riel's conclusory denials, as discussed below, the Court finds that Defendant Riel has failed to raise an issue of material fact and that the SEC is entitled to summary judgment.

**3. *Primary Violations of Securities Act Section 17(a), Exchange Act Section 10(b), and Rule 10b-5***

"Section 10(b) of the Exchange Act and Rule 10b-5, which prohibit fraud in the purchase or sale of a security, are violated if a person has '(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'" *S.E.C. v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) (quoting *S.E.C. v. Pentagon Capital Management PLC*, 725 F.3d 279, 285 (2d Cir. 2013)) (other quotation omitted). "A false statement was made with the requisite scienter if it was made with the 'intent to deceive, manipulate, or defraud.'" *Id.* (quoting *S.E.C. v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)). "'[S]cienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.'" *Id.* (quotation omitted). The elements of a claim under § 17(a) of the Securities Act, which prohibits fraud in the "offer or sale" of a security, 15 U.S.C. § 77q(a), are "[e]ssentially the same" as the elements of claims under § 10(b) and Rule 10b-5. *See id.* (citation omitted); *see also S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (noting that "[e]ssentially the same elements are required under Section 17(a)(1)-(3) in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)").

Additionally, the SEC must also establish that the fraud was committed "by the use of any means" or instrumentality of "interstate commerce." 15 U.S.C. §§ 77q & 78j(b). This element may be established by demonstrating that the fraud was committed through the use of a telephone or emails, or that he simply used them during some phase of his fraud. *See S.E.C. v. Stanard*, No. 06 Civ. 7736, 2009 WL 196023, *25 (S.D.N.Y. Jan. 27, 2009) (citations omitted).

### a. "Instrumentality of Interstate Commerce"

"A fraud has been committed 'by the use of any means or instrumentality of interstate commerce' if the defendant used some means of interstate communication (such as a telephone call), in some phase of the transaction." *Stanard*, 2009 WL 196023, at *25 (quoting *Richter v. Achs*, 962 F. Supp. 31, 33 (S.D.N.Y. 1997)).

In the present matter, the Court finds that Defendant Riel's telephone calls and emails with Singleton and Tutor satisfy this element. *See* Dkt. No. 24-2 at ¶¶ 83-85, 103-14, 118-21, 125-32, 134-39, 146-50, 190-200.

### b. Misrepresentations to Investors

The undisputed facts establish that Defendant Riel made false and misleading statements to investors in several ways: (1) on the 150% Return and REinvest websites, (2) in direct conversations with Tutor, and (3) in emails to Singleton. For example, on the 150% Return Website, Defendant Riel claimed that REinvest offered a "high yield investment" in a "highly diversified . . . financial growth vehicle" that used a "proprietary method" to provide returns of 50% to 150% over a five-year term "with inherently low risk" and a "built-in safety net process." Dkt. No. 24-2 at ¶¶ 5-9, 23-25. On the REinvest Website, Defendant Riel implied that REinvest could provide investors with high return rates through its investments in commercial real estate.

*See id.* at ¶¶ 6, 10, 28-30.[4]  Similarly, Defendant Riel orally represented to Tutor that REinvest earned high rates of return through real estate loans.  *See id.* at ¶¶ 84-85.  Additionally, on the 150% Return Website, Defendant Riel further claimed through purported investor testimonials that REinvest had many satisfied investors, including a couple who had earned $1,000,000 and an investor who had earned "triple digit" returns from REinvest.  *See id.* at ¶¶ 34-38.  Finally, after Singleton's first investment and before his second, Defendant Riel emailed him an account statement showing that Singleton had earned a monthly return that, when annualized, equaled almost 30%.  *See id.* at ¶¶ 125-28.

These statements, among others as detailed above, were false and misleading.  *See S.E.C. v. StratoComm Corp.*, 652 Fed. Appx. 35, 37 (2d Cir. 2016) (finding that the district court "properly concluded that the statements, taken together, created a misleading and false impression").  Contrary to Defendant Riel's assertions, the undisputed facts demonstrate that REinvest had no "low risk," highly diversified," and "proprietary" investment method.  Rather, Defendant Riel used most of the money on personal expenses, unrelated to any investments.  *See* Dkt. No. 24-2 at ¶¶ 23-25, 50, 58, 66, 80, 102, 124, 145, 151-58.  Further, of the small portion of the investment funds that were "invested," Defendant Riel lost almost 90% of that money within eighteen months.  *See id.* at ¶¶ 51-52, 59-61, 67-73, 156-57.  Contrary to Defendant Riel's conclusory assertions, REinvest never produced any investment returns and the investor testimonials were entirely fictitious.  Although Defendant Riel returned $87,500 of Cossey's $125,000 investment, he used a later investor's funds to repay her in Ponzi-scheme fashion.  *See id.* at ¶¶ 159-60.  During all of this, Defendant Riel neither disclosed REinvest's risky futures

---

[4] "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

trading nor his intention to use investors' funds for his personal expenses. *See id.* at ¶¶ 26-27, 44, 85-86.

### c. The Misrepresentations Were Material

A misrepresentation or omission is "material" if "a reasonable investor would have considered [it] significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). "'[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). "An omitted fact may be immaterial if the information is trivial, . . . or is so basic that any investor could be expected to know it." *Ganino*, 228 F.3d at 162 (internal citations omitted). "Therefore, whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case." *Id.* As such, materiality is a mixed question of law and fact. *See id.*

As the SEC correctly contends, Defendant Riel's misrepresentations were "so obviously important to the investor that reasonable minds cannot differ on the question of materiality." *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir. 1978) (citation omitted). No reasonable investor would have invested with REinvest had he or she known that REinvest did not invest in real estate or any other business, that Defendant Riel and REinvest did not intend to invest most of the funds for a return, or that Defendant Riel would use most of the investment funds for personal expenses. *See Research Automation*, 585 F.2d at 35. Additionally, Defendant Riel's misrepresentations about REinvest's "low risk," "highly diversified" investment was also material, considering that the only investment made was in highly risky futures trading. *See*

*C.F.T.C. v. Rolando*, 589 F. Supp. 2d 159, 170 (D. Conn. 2008) ("Trading in futures and options is inherently risky. . . . [A] reasonable investor would want to know that his funds were being invested in futures and options and the risks associated with that investment"). Similarly, Defendant Riel's phony account statement to Singleton to convince him to invest more money with REinvest was material as a matter of law. *See id.* at 170 (holding that "a reasonable investor would want to know that his account statements were false"); *Yadav v. Punj*, No. 11 Civ. 1500, 2013 WL 3975943, *6 (S.D.N.Y. Aug. 5, 2013) (holding that the defendant made a material misrepresentation when he provided the plaintiff with "a false account statement claiming that an initial investment of $250,000 had grown to $950,000").

### d. The Misrepresentations Were Made With Scienter

In a securities fraud case, the plaintiff may establish scienter by either "(1) showing the defendants' motive and opportunity to perpetrate fraud, or (2) alleging 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Iowa Public Employee's Retirement System v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013) (quotation and other citation omitted). When a plaintiff seeks to establish scienter through conscious misbehavior or recklessness, the alleged reckless conduct must be behavior that is "'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Kalnit*, 264 F.3d at 142) (other quotations omitted). "In the case of securities fraud, the Second Circuit has noted on multiple occasions that plaintiffs' allegations 'suffice[ ] to state a claim based on recklessness when they . . . specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements.'" *Id.* (quotation and other citation omitted); *see also S.E.C. v. Universal Express, Inc.*,

475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007) ("Representing information as true while knowing it is not, recklessly misstating information or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter").

In the present matter, the SEC has offered both circumstantial evidence of Defendant Riel's scienter, as well as his own admissions that he knew that certain of his representations to investors were false or misleading. The undisputed facts establish that Defendant Riel was the only person who operated REinvest, its websites, and its accounts, and that he did not invest the majority of investors' funds in anything other than brief futures trading. Additionally, as discussed above, Defendant Riel withdrew significant portions of the "investments" from the REinvest Bank Accounts through cash withdrawals, writing checks to cash, and writing checks to himself. Further, the evidence demonstrated that Defendant Riel made personal purchases and paid bills unrelated to any investments from the REinvest Bank Accounts. These facts demonstrate that Defendant Riel "benefitted in a concrete and personal way from the purported fraud," which satisfies the scienter element. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000); *see also Yadav*, 2013 WL 3975943, at *6 (holding that, where the defendant received funds and deposited them directly into his personal banking account, the defendant personally benefitted in a concrete way from the purported fraud, which fulfills the element of scienter); *S.E.C. v. Constantin*, 939 F. Supp. 2d 288, 309 (S.D.N.Y. 2013) (holding that the SEC had satisfied the scienter requirement where the record established that the defendant lied to clients about his investment experience, his company's size and involvement in international markets, and the amount of return that clients could expect from their investments). Defendant Riel's scienter is further demonstrated by the phony account statements he prepared that reflected information that he knew to be untrue at the time they were prepared. *See id.*; *see also United*

*States v. Kelley*, 551 F.3d 171, 175-76 (2d Cir. 2009) (finding that "bogus account statements" created by the defendant to conceal his theft of clients' funds "tended to demonstrate [the defendant's] intent to defraud"). Defendant Riel's state of mind is also evidence from his instruction Tutor to "discard/delete" documents sought by the SEC and by seeking "clarification statements" from Tutor and Singleton.

Based on the foregoing, the Court finds that the undisputed facts demonstrate that Defendant Riel acted with the requisite scienter to find him liable for the violations alleged.[5]

### e. In Connection With the Sale of Securities

### i. The Promissory Notes Were Securities

In response to the SEC's motion for summary judgment, Defendant Riel argues that the "REinvest promissory notes were not securities." Dkt. No. 36 at 7. Rather, Defendant Riel claims that the REinvest "promissory notes were to serve as an alternative-private investment in the form of a loan[.]" *Id.* While acknowledging that the word "security" was used, Defendant Riel argues that the use of the word "security" is only one factor to consider. *See id.* Further, Defendant Riel contends that "the documents governing Tutor's and Singleton's REinvest documents referred to Tutor and Singleton as 'private investment lender[s].' The written agreements clearly stated them as 'Lender[s]' because that is what they were. These were private-loan agreements and each was clearly stated as such." *Id.*

"The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.'" *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990)

---

[5] Additionally, the Court notes that district courts in the Second Circuit routinely grant the SEC summary judgment where the defendant asserts his Fifth Amendment privilege, instead of testifying about his mental state, and therefore cannot rebut the SEC's circumstantial scienter evidence. *See Constantin*, 939 F. Supp. 2d at 309-10 & n.14; *Global Telecom Servs.*, 325 F. Supp. 2d at 110, 115-19; *Cavanagh*, 2004 WL 1594818, at *26-*27.

(quoting *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849, 95 S. Ct. 2051, 2059, 44 L. Ed. 2d 621 (1975)). "In defining the scope of the market that it wished to regulate, Congress painted with a broad brush." *Id.* "It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits,' . . . and determined that the best way to achieve its goal of protecting investors was 'to define the term 'security' in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *Id.* at 60-61 (internal and other quotations omitted). "Congress therefore did not attempt precisely to cabin the scope of the Securities Acts. Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Id.* at 61.

The Supreme Court has described a modified version of the Second Circuit's "family resemblance" test for determining whether a note constitutes a security. *See Reves*, 494 U.S. at 63-65 (citing *Exchange Nat. Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976); *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir. 1984)). All notes are presumed to be securities unless they "bear[ ] a strong resemblance" to instruments widely held to be non-security notes. *See id.* Such non-security notes include:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a "character" loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business . . . [and] notes evidencing loans by commercial banks for current operations.

*Reves*, 494 U.S. at 65 (internal quotations and citations omitted).

If the note at issue is not sufficiently similar to one of the enumerated non-security categories, the Court next applies the four factors identified in *Reves*: "'(1) the motivations that would prompt a reasonable buyer and seller to enter into the transaction; (2) the plan of distribution of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary.'" *Pollack*, 27 F.3d at 812 (quotations omitted). The factors are not elements, each of which must be met, but are instead points of comparison for the ultimate determination of "family resemblance."

First, Defendant Riel's and the investors' motivations demonstrate that they intended REinvest's promissory notes to serve as investments, a factor indicative of a security. *See Pollack*, 27 F.3d at 812 ("The inquiry is whether the motivations are investment (suggesting a security) or commercial or consumer (suggesting a non-security)"); *Reves*, 494 U.S. at 67-68 ("The Co-Op sold the notes in an effort to raise capital for its general business operations, and purchasers bought them in order to earn a profit in the form of interest"). According to Tutor, Defendant Riel told him that his investment proceeds "would be used for REinvest's business," which involved "marketing short-term loans to the real estate industry in exchange for a high-interest rate of return," and promised Tutor a 150% return on his REinvest investment – 37.5% per year over four years. *See* Dkt. No. 28 at ¶ 5. Tutor claimed that he provided the funds to REinvest because he was looking for a significant return on investment. *See id.* at ¶ 3. Additionally, the agreements governing Tutor's and Singleton's REinvest notes referred to Tutor and Singleton as "private investment lender[s]" and to the promised rate of return as a "return on investment." Dkt. No. 24-2 at ¶¶ 90-91, 113-14. Additionally, when Singleton expressed

concern after Defendant Riel sought a "clarification statement" from him, Defendant Riel twice reiterated that the transaction was an "investment vehicle." *Id.* at ¶¶ 190-92, 199. The undisputed facts clearly demonstrate that both sides understood that the purpose of the "promissory notes" was to serve as investments.

Second, the fact that REinvest's "plan of distribution" was to market the notes "over an extended period" to a broad segment of the public," which is another factor indicative of a security. *See Reves*, 494 U.S. at 68 ("To be sure, the notes were not traded on an exchange. They were, however, offered and sold to a broad segment of the public"); *Nussbaum v. Mezei*, No. 09 Civ. 10287, 2012 WL 3613813, *11 (S.D.N.Y. Aug. 22, 2012) (noting that "the Repotex notes were not sold to a broad segment of the public — they were offered only to friends and business associates of Mr. Mezei . . . However, while the offering certainly is not comparable to publicly traded stocks, it also is not the equivalent of an isolated transaction with a single investor. Rather, the Repotex notes were offered to individuals and institutions alike and were issued to over eleven such investors"). Defendant Riel advertised on Google to direct viewers to the 150% Return Website and then used the website to market the REinvest notes. *See* Dkt. No. 24-2 at ¶¶ 23-42. As such, the Court finds that this second factor supports the conclusion that the notes were securities.

Third, the Court must assess the expectations of the investing public. As the Supreme Court stated in *Reves*, "[w]e have consistently identified the fundamental essence of a 'security' to be its character as an investment." *Reves*, 494 U.S. at 68-69. Thus, this factor is an objective test that turns on whether a reasonable purchaser would have perceived the notes to be an investment. *See id.* Here, the Court finds that it would be reasonable for a prospective purchaser to view the REinvest notes as an investment because the 150% Return Website advertised the notes as a

"high yield investment," as a "financial growth vehicle," and as one of the "best high return investment opportunities." Dkt. No. 24-2 at ¶¶ 23-25; *Reves*, 494 U.S. at 69 ("The advertisements for the notes here characterized them as 'investments,' . . . and there were no countervailing factors that would have led a reasonable person to question this characterization").

Finally, as the SEC correctly contends, the fourth factor also favors finding that the notes are securities because the REinvest notes "would escape federal regulation entirely if the [Securities and Exchange] Acts were held not to apply." *Reves*, 494 U.S. at 69. The notes appear to have been "uncollateralized and uninsured," and, therefore, presumably not subject to federal banking or pension laws. *See id.*

### ii. The Misrepresentations Were in Connection With the Notes' Sales

Courts interpret the "in connection with" requirement broadly. *See S.E.C. v. Zandford*, 535 U.S. 813, 819-20 (2002). Misrepresentations that "somehow induced the purchaser to purchase the security at issue" satisfy the "in connection with" requirement. *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 537 (2d Cir. 1999).

In the present matter, the undisputed facts clearly establish that Defendant Riel made misrepresentations to investors in order to sell them the REinvest promissory notes. As such, the Court finds that Defendant Riel's misrepresentations occurred "in connection with" the sale of securities.[6]

_____

[6] While Section 10(b) prohibits fraud "in connection with the purchase or sale of any security," Section 17(a) prohibits fraud "in the offer or sale of any securities." 15 U.S.C. §§ 77q(a) & 78j(b). No meaningful difference exists between these formulations, at least where the fraud induced the securities' purchase. *See United States v. Naftalin*, 441 U.S. 768, 773 n.4 (1979) (noting, without deciding the issue, that "we are not necessarily persuaded that 'in' is narrower than 'in connection with'" and that "[b]oth Congress . . . and this Court . . . have on

(continued...)

Based on the foregoing, the Court grants the SEC's motion for summary judgment against Defendant Riel as to the claims regarding the primary violations.

### 4. Aiding and Abetting REinvest's Primary Violations of Section 17(a), Section 10(b), and Rule 10b-5

Securities Section 15(b) and Exchange Act Section 20(e) each provide that "any person that knowingly or recklessly provides substantial assistance to another person in violation of" the Securities or Exchange Act or rules or regulations thereunder "shall be deemed to be in violation of such provision." 15 U.S.C. §§ 77o(b) & 78t. "In order for a defendant to be liable as an aider and abettor in a civil enforcement action, the SEC must prove: '(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) "knowledge" of this violation on the part of the aider and abettor; and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.'" *S.E.C. v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quotations omitted).

First, as discussed above, Defendant Riel was the owner and only employee of REinvest. Defendant Riel's actions on REinvest's behalf are imputed to REinvest. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 543 (S.D.N.Y. 2011) ("When the defendant is a corporate entity, the law imputes the state of mind of the employees or agents who made the statement(s) to the corporation") (citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)); *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550 (S.D.N.Y. 2007) ("[P]rincipals typically are liable for torts and crimes committed by

---

[6](...continued)
occasion used the terms interchangeably"); *S.E.C. v. Norton*, No. 95 Civ. 4451, 1997 WL 611556, *3 n.1 (S.D.N.Y. Oct. 3, 1997) ("Although Section 17 of the Securities Act refers to 'in the offer or sale of any securities' and Section 10(b) of the Exchange Act requires misstatements made 'in connection with the purchase or sale of any security,' the Court will treat the two phrases interchangeably") (citing *Naftalin*, 441 U.S. at 773).

their agents acting within the scope of their authority. This . . . has [long] been applied to impose *respondeat superior* liability in federal securities and criminal cases even where the principal itself has committed no primary violation") (citations omitted). Second, as discussed above, Defendant Riel acted knowingly in aiding and abetting the violation. Third, Defendant Riel substantially assisted REinvest's violations. To satisfy the "substantial assistance" component of aiding and abetting, "the SEC must show that the defendant 'in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.'" *Apuzzo*, 689 F.3d at 206 (quotation omitted). Defendant Riel took each of these steps with respect to his and REinvest's fraud. Defendant Riel personally made misrepresentations on REinvest's websites, in oral statements to Tutor, and in emails to Singleton. Thereafter, instead of investing the funds, they were misappropriated for his personal benefit.

Based on the foregoing, the Court grants the SEC's motion for summary judgment as to the aiding and abetting claims against Defendant Riel.

### 5. Control Person Liability for REinvest's Section 10(b) and Rule 10b-5 Violations

Exchange Act Section 20(a) renders control persons liable for the fraud of entities they control:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  To prove a claim for control person liability, the SEC must establish the following: "'(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quotation omitted).

It is well settled that parties may plead alternative theories of liability.  However, the law is clear that "a party may not ultimately be held liable under both Section 10(b) and Section 20(a) for the same underlying conduct[.]"  *In re Alstrom SA*, 454 F. Supp. 2d 187, 210-11 (S.D.N.Y. 2006) (citations omitted); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 412 (S.D.N.Y. 2005) (citation omitted); *Kalnit v. Eichler*, 85 F. Supp. 2d 232, 246 (S.D.N.Y. 1999).  Since the SEC relies on the same underlying conduct for the "control person" and the "primary violator" claims, the SEC's motion for summary judgment as to this claim must be denied.

### 6. The SEC's Requested Injunction, Disgorgement, and Civil Penalties

In its motion, the SEC argues that the Court "should permanently enjoin Riel from violating Section 17(a), Section 10(b), and Rule 10b-5, order him to disgorge his ill-gotten gains with prejudgment interest, and pay the maximum amount of civil penalties."  Dkt. No. 24-1 at 40.

### a. Permanent Injunction

Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act entitle the SEC to obtain permanent injunctive relief upon a showing that: (1) violations of securities laws occurred, and (2) there is a reasonable likelihood that violations will occur in the future.  *See S.E.C. v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99-100 (2d Cir. 1978).  There are several

factors to consider with regard to issuing an injunction for future violations, including the following:

> The likelihood of future violations, the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*S.E.C. v. Universal Major Industries Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976) (citations omitted); *see also S.E.C. v. Wheeler*, 56 F. Supp. 3d 241, 247-48 (W.D.N.Y. 2014) (quotation omitted).

In the present matter, the Court finds that the SEC has established that Defendant Riel should be permanently enjoined from committing future violations. First, the nature of Defendant Riel's violations, in which he solicited "investments" through repeated lies and misrepresentations, make it likely that he would engage in similar conduct in the future. The undisputed facts make clear that Defendant Riel continued to solicit additional investments up until the time that the SEC began its investigation. Even after the investigation began, Defendant Riel contacted "investors" and instructed them to not comply with the SEC's investigators and further asked them to sign amended documents that were intended to conceal the true nature of his scheme. *See* Dkt. No. 27-30 at 2-6. Such conduct indicates that Defendant Riel could engage in this conduct in the future and belies the sincerity of his assurances against future violations.

Additionally, as discussed, Defendant Riel did not commit an isolated violation. Rather, over a period of thirty-six months, Defendant Riel continuously solicited investments through his repeated lies. Finally, Defendant Riel has repeatedly denied the wrongful nature of his conduct and continues to do so in his response to the pending motion. *See* Dkt. No. 36 at 9-10; Dkt. No. 27-30 at 2-6.

Moreover, as discussed above, Defendant Riel acted with a high degree of scienter. Defendant Riel made substantial and numerous material misrepresentations regarding REinvest, his experience, and the money he allegedly made for past investors. Then, to induce additional investments after losing or misappropriating previously invested amounts, Defendant Riel sent fake account statements representing that the initial investment was generating substantial amounts of interest.

Based on the foregoing, the Court finds that the relevant factors amply support a permanent injunction. *See S.E.C. v. Tavella*, 77 F. Supp. 3d 353, 359 (S.D.N.Y. 2015). As such, the Court grants the SEC's request to permanently enjoin Defendant Riel from future violations of the securities laws.

### b. Disgorgement of Profits

"'Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits.'" *S.E.C. v. Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (quoting *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996)). "Disgorgement 'is a method of forcing a defendant to give up the amount by which he was unjustly enriched.'" *Id.* (quotation omitted). "Thus, in order to establish a proper disgorgement amount, 'the party seeking disgorgement must distinguish between the legally and illegally derived profits,' . . . so that disgorgement is ordered only with respect to those that were illegally derived." *Id.* (internal quotation omitted).

The amount of disgorgement ordered need only be "a reasonable approximation of profits causally connected to the violation" and "any 'risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *S.E.C. v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995) (quotation omitted). Moreover, the court should not withhold the

remedy of disgorgement even if the defendant offers evidence that he cannot presently pay a disgorgement award based on his current income and assets.  *See S.E.C. v. Inorganic Recycling Corp.*, No. 99 Civ. 10159, 2002 WL 1968341, *4 (S.D.N.Y. Aug. 23, 2002).

In the present matter, the Court finds that a disgorgement award in the amount of $197,500.00, plus prejudgment interest.  This amount constitutes the total amount Defendant Riel obtained from his five investors based on his fraudulent misrepresentations ($285,000) minus the funds that Defendant Riel repaid to Cossey ($87,500).  *See* Dkt. No. 24-2 at ¶¶ 43, 115-16, 140, 145, 159-60; Dkt. No. 38 at 6 n.2.  "Requiring payment of [prejudgment] interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity."  *S.E.C. v. Morgan*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).  To calculate prejudgment interest, courts use the interest rate imposed by the Internal Revenue Service ("IRS") for underpayment.  *See S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996).[7]

In determining the appropriate amount of prejudgment interest, the SEC applied the IRS rate to the total amount of Defendant Riel's ill-gotten proceeds from the first day of the month following the last date on which Defendant Riel received an investment, *i.e.*, November 1, 2013. The Court finds this method appropriate and notes that it favors Defendant Riel by not charging him with interest from the first date he received an investment.  Using this method, the Court finds that the total interest accrued from November 1, 2013 through September 27, 2017 is $27,875.20.[8]

_____

[7] As of December 31, 2016, based on the IRS underpayment rate, the amount of prejudgment interest was $21,233.10.  *See* Dkt. No. 38 at 6 n.2.

[8] To determine this amount, the Court used the IRS interest calculator available at

(continued...)

Based on the foregoing, the Court grants the SEC's requested disgorgement of $197,500.00 plus prejudgment interest of $27,875.20.

### c. Civil Penalties

"Both the 1933 and 1934 Acts authorize three tiers of monetary penalties for statutory violations." *S.E.C. v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013) (citing 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3)). "Under each statute, a first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation 'involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement'; a third-tier penalty may be imposed when, in addition to meeting the requirements of the second tier, the 'violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons,'" *Razmilovic*, 738 F.3d at 38 (quoting 15 U.S.C. §§ 77t(d)(2)(A)-(C); 15 U.S.C. §§ 78u(d)(3)(B)(i)-(iii)).

"Each tier provides that, for each violation, the amount of penalty 'shall not exceed the greater of ' a specified monetary amount or the defendant's 'gross amount of pecuniary gain[.]'" *Id.* (quoting 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B)). For violations occurring after March 3, 2009 and before March 5, 2013, the third-tier penalty for natural persons is the greater of $150,000 per violation or the gross pecuniary gain to the violator from each violation. *See* 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(ii); 17 C.F.R. § 201.1004. For violations occurring after March 5, 2013, the third-tier penalty for natural persons is the greater of $160,000 per violation or the gross amount of pecuniary gain to the violator from each violation. *See* 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(ii); 17 C.F.R. § 201.1005.

---

[8](...continued)
https://www.irscalculators.com/interest-calculator.

"Though the maximum penalty is set by statute on the basis of tier, the actual amount of the penalty is left up to the discretion of the district court." *S.E.C. v. Tourre*, 4 F. Supp. 3d 579, 593 (S.D.N.Y. 2014) (citing *S.E.C. v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005)). "In exercising this discretion, courts weigh '(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.'" *Id.* (quoting *S.E.C. v. Haligiannis*, 470 F. Supp. 2d 373, 386 (S.D.N.Y. 2007)) (other citation omitted). Additionally, in determining an appropriate civil monetary penalty, the court must consider that these provisions are intended to punish the violator and deter future violations. *S.E.C. v. Garfield Taylor, Inc.*, 134 F. Supp. 3d 107, 110 (D.D.C. 2015) (citation omitted).

In the present matter, the Court finds that third-tier penalties are warranted. Defendant Riel's violations involved fraud, deceit and manipulation and the violations directly resulted in substantial losses. As the SEC correctly contends, Defendant Riel's violations relating to his fraud on Cossey, Villatore, and Tutor occurred after March 3, 2009 and before March 5, 2013, thereby making the $150,000 maximum applicable to these violations. The violations involving Singleton and Weinberg occurred after March 5, 2013, thereby rendering the $160,000 maximum applicable.

Defendant Riel's egregious conduct was knowingly undertaken and the record makes clear that, had the SEC not commenced its investigation, it would have continued. Further, Defendant Riel engaged in this conduct for more than three years and the violations were not isolated incidents. Although the first four factors favor increasing the amount of the penalty

imposed, Defendant Riel's current and future financial condition warrants the imposition of a reduced penalty. *See* Dkt. No. 36 at 12.

As to the number of violations, the SEC argues that the Court should find that Defendant Riel committed five separate violations by concluding that each victim of Defendant Riel's scheme should be considered a separate violation. While there is support for this position, "other courts have assessed only a single penalty where the violations arose from a single scheme or plan." *Garfield Taylor, Inc.*, 134 F. Supp. 3d at 110 (citations omitted); *see also S.E.C. v. Rabinovich & Assocs., LP*, No. 07 Civ 10547, 2008 WL 4937360, *6 (S.D.N.Y. Nov. 18, 2008) (concluding, following fraudulent scheme that raised $2,250,000 from more than 150 investors that, "[a]lthough [the defendant] engaged in repeated violations of the securities laws, they all arose from a single scheme or plan," and assessing a penalty of $130,000); *S.E.C. v. Kenton Capital Ltd.*, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (counting each of the twelve investors who sent money to the defendant as an individual violation, and assessing $100,000 per violation, for a total penalty of $1.2 million); *S.E.C. v. GTF Enters., Inc.*, No. 10–CV–4258, 2015 WL 728159, *4 (S.D.N.Y. Feb. 19, 2015) (describing various methods of determining the number of "violations"). Since the violations here arose out of a single scheme or plan, for purposes of this case the Court will apply a single monetary penalty. *See Garfield Taylor, Inc.*, 134 F. Supp. 3d at 110.

In light of all of the factors set forth above, the Court finds that a monetary penalty of $125,000.00 is appropriate in the present matter. Although Defendant Riel's financial situation warrants a slight reduction in the amount of the civil penalty, "in light of the goal of deterrence, a defendant's claims of poverty cannot defeat the imposition of a civil penalty by a court." *S.E.C. v. Kane*, No. 97 Civ. 2931, 2003 WL 1741293, *4 (S.D.N.Y. Apr. 1, 2003) (citing cases).

**B. Motion for Default Judgment Against REinvest**

*1. Default Judgment Standard*

"Generally, 'Federal Rule of Civil Procedure 55 provides a two-step process that the Court must follow before it may enter a default judgment against a defendant.'" *United States v. Carpineta*, No. 3:14-CV-0517, 2015 WL 500815, *1 (N.D.N.Y. Feb. 5, 2015) (quotation omitted). "'First, under Rule 55(a), when a party fails to "plead or otherwise defend . . . the clerk must enter the party's default."'" *Id.* (quotation omitted); Fed. R. Civ. P. 55(a). "Second, under Fed. R. Civ. P. 55(b)(1), '[u]pon request of the plaintiff, a default judgment may be entered by the clerk when (1) the plaintiff's claim against the defendant is for a sum certain, (2) the plaintiff has submitted an affidavit of the amount due, and (3) the defendant has been defaulted for failure to appear.'" *Id.*

When entry by the clerk is inappropriate, "'pursuant to Rule 55(b)(2), the party seeking default is required to present its application for entry of judgment to the court.'" *United States v. Simmons*, No. 5:10-CV-1272, 2008 WL 685498, *2 (N.D.N.Y. Mar. 2, 2012) (quotation omitted). "'Notice of the application must be sent to the defaulting party so that it has an opportunity to show cause why the court should not enter a default judgment.'" *Id.* (quotation omitted); *see also* Fed. R. Civ. P. 55(b)(2).

When seeking a default judgment, the Local Rules require the party to submit an affidavit attesting to the following:

> 1. The party against whom it seeks judgment is not an infant or an incompetent person;
>
> 2. The party against whom it seeks judgment is not in the military service, or if unable to set forth this fact, the affidavit shall state that the party against whom the moving party seeks judgment by default is in the military service or that the party seeking a default

judgment is not able to determine whether or not the party against whom it seeks judgment by default is in the military service;

3. The party has defaulted in appearance in the action;

4. Service was properly effected under Fed. R. Civ. P. 4;

5. The amount shown in the statement is justly due and owing and that no part has been paid except as set forth in the statement this Rule requires; and

6. The disbursements sought to be taxed have been made in the action or will necessarily be made or incurred.

N.D.N.Y. L.R. 55.2(a).

"When a default is entered, the defendant is deemed to have admitted all of the well-pleaded factual allegations in the complaint pertaining to liability." *Bravado Int'l Group Merch. Servs. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 188 (E.D.N.Y. 2009) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). "While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation." *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) (citations omitted); *see also Bravado Int'l*, 655 F. Supp. 2d at 189-90 (citation omitted). "[E]ven upon default, a court may not rubber-stamp the non-defaulting party's damages calculation, but rather must ensure that there is a basis for the damages that are sought." *Overcash v. United Abstract Group, Inc.*, 549 F. Supp. 2d 193, 196 (N.D.N.Y. 2008) (citing *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)). "The burden is on the plaintiff to establish its entitlement to recovery." *Bravado Int'l*, 655 F. Supp. 2d at 189 (citing *Greyhound Exhibitgroup, Inc.*, 973 F.2d at 158). "While 'the court must ensure that there is a basis for the damages specified in a default judgment, it may, but need not, make the determination through a hearing.'" *Id.* at 190 (quotation omitted).

### *2. Application*

In the present matter, the Court finds that the SEC has established through its complaint and moving papers that it is entitled to judgment in its favor against Defendant REinvest.  As REinvest's manager, Defendant Riel waived service of the summons on REinvest's behalf and the SEC promptly filed REinvest's waiver.  *See* Dkt. No. 8.  As such, proof of service was not required.  *See* Fed. R. Civ. P. 4(d)(4).  Thereafter, Magistrate Judge Peebles ordered REInvest to answer or otherwise respond to the complaint by January 21, 2016.  *See* Dkt. No. 13.  REinvest has since defaulted by failing to appear, answer, or otherwise defend itself.  *See* Dkt. No. 21.

On December 2, 2016, the SEC requested the Clerk of the Court to enter default against REinvest, which was entered on December 5, 2016.  *See* Dkt. Nos. 20 & 21.  Further, the SEC has provided that the party in default is not an infant or an incompetent person, and is not in military service.  *See* Dkt. No. 20.

As to the substantive allegations against Defendant REinvest, since REinvest was a one-person operation, the facts set forth above as to Defendant Riel are equally applicable to REinvest.  Having reviewed the complaint, the Court finds that the well-pleaded allegations establish REinvest's liability.  "'To prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation.'"  *Marini v. Adamo*, 995 F. Supp. 2d 155, 197 (E.D.N.Y. 2014) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).  Since Defendant Riel was the owner and sole employee of REinvest, his actions are indisputably attributable to REinvest.  *See id.* (citations omitted); *see also S.E.C. v. Constantin*, 939 F. Supp. 2d 288, 309 (S.D.N.Y. 2013) (holding that, because the two individual defendants were essential the

corporate defendant's only two employees, "their knowing and intentional misconduct is clearly attributable to . . . the corporate defendant").

### 3. Requested Relief

As to the relief request, the Court first finds that the SEC is entitled to the requested permanent injunction against REinvest. *See S.E.C. v. Syndicated Food Services Intern., Inc.*, No. 04-cv-1303, 2010 WL 4668777, *1-*2 (E.D.N.Y. Nov. 9, 2010) (issuing default judgment permanently enjoining the defendant from future violations of the federal securities laws, in reliance on the complaint's allegations). As set forth in the complaint, Defendants Riel and REinvest misled investors about the very nature of their investment, and Defendant Riel used investor proceeds for his personal purposes. *See* Dkt. No. 1 at ¶¶ 26-97. An injunction is warranted to ensure that REinvest does not resume its fraud or state a new fraud, and the relevant factors weigh heavily in favor of an injunction. REinvest, through Defendant Riel, had a high degree of scienter as the complaint alleges that Defendant Riel knowingly committed the fraudulent activity. *See id.* at ¶¶ 32-33, 36, 41, 45, 50, 57, 62, 65, 78-79, 82, 98-104. Additionally, REinvest's conduct was recurrent as the complaint alleges that the conduct spanned more than three years and involved repeated misrepresentations to investors. *See id.* at ¶¶ 1-3, 26-97. Moreover, REinvest has defaulted in this action and, therefore, has not recognized the wrongful nature of its conduct and has made no assurances against future violations. Finally, given REinvest's use of two separate websites, there is a chance that it could use these or other websites to conduct future securities fraud if the Court declines to enjoin REinvest. Accordingly, the Court grants the SEC's motion insofar as it seeks to permanently enjoin REInvest from future violations of Section 17(a), Section 10(b), and Rule 10b-5.

Next, the Court finds that disgorgement of $197,500.00 is appropriate.  In addition to the reasons set forth above as to Defendant Riel, the Court notes that "where two or more individuals or entities collaborate or have a close relationship in engaging in the violations of the securities laws, they have been held jointly and severally liable for the disgorgement of illegally obtained proceeds."  *S.E.C. v. First Pacific Bancorp*, 142 F.3d 1186, 1191-92 (9th Cir. 1998) (citations omitted); *see also S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996) (finding that the individual defendant could be made jointly and severally liable for the disgorgement of the total amount of the corporate defendant's profits).  Additionally, the Court finds that, from November 1, 2013 through September 27, 2017, prejudgment interest of $27,875.20 has accrued.

Finally, as to the civil penalty, the Court declines to impose the maximum penalty requested by the SEC.  REinvest, which is an entity as opposed to a natural person, is subject to higher potential third-tier penalties.  For violations occurring after March 3, 2009 and before March 5, 2013, the third-tier penalty for entities is the greater of $750,000.00 per violation or the gross amount of the pecuniary gain to that entity from each violation.  *See* 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(ii); 17 C.F.R. § 201.1004.  For the violations occurring after March 5, 2013, the third-tier penalty for entities is the greater of $775,000.00 per violation or the gross amount of the pecuniary gain to that entity from each violation.  *See* 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(ii); 17 C.F.R. § 201.1005.  If the Court were to find the number of violations requested by the SEC (five) and apply the statutory maximum civil penalties, this would result in a civil penalty of $3,725,000.00.  The Court finds that such an amount, given the facts of this case, would be grossly disproportionate to the fraud perpetrated.

Initially, the Court was inclined to hold Defendants Riel and REinvest jointly and severally liable for the same civil monetary penalty, since Defendant Riel is the owner and only employee of REinvest.  The Second Circuit has made clear, however, that a finding of joint and several liability for civil penalties is contrary to the securities statutes providing for a civil penalty.  *See S.E.C. v. Pentagon Capital Management PLC*, 725 F.3d 279, 287 (2d Cir. 2013).[9]  Considering that REinvest and Defendant Riel are one and the same, the Court declines to grant the SEC's request for a civil penalty against Defendant REinvest.  Such a penalty would penalize Defendant Riel for the same conduct that the Court found warranted the imposition of the civil monetary penalty discussed above.  *See S.E.C. v. Nadel*, 206 F. Supp. 3d 782, 785 n.1 (E.D.N.Y. 2016); *S.E.C. v. Wheeler*, 56 F. Supp. 3d 241, 248 (W.D.N.Y. 2014) (declining to award a civil penalty against the corporate defendant website where the individual defendant was the sole owner, employee and operator of the website and, having imposed a civil penalty against the individual defendant, the court found that any additional penalty against the website would not serve the interests of justice and would double the monetary punishment against the individual defendant).  Based on the foregoing, the Court declines to order a civil monetary penalty against Defendant REinvest.

## IV. CONCLUSION

---

[9] In its ruling, the Second Circuit held that the "statutory language allowing a court to impose a civil penalty plainly requires that such awards be based on the 'gross amount of pecuniary gain *to such defendant*.'"  *Pentagon Capital*, 725 F.3d at 288 (quoting 15 U.S.C. § 77t(d)(2)) (emphasis added).  According to the Second Circuit, "[t]his language does not provide room for the district court's interpretation that the civil penalty be imposed jointly and severally." *Id.*  While the Court generally agrees with this interpretation, the present matter presents a unique situation in that Defendant Riel was REinvest's owner and only employee.  REinvest was based out of Defendant Riel's home and he clearly used the REinvest Bank Accounts as his own personal accounts.  Since REinvest was nothing more than Defendant Riel's alter ego, Defendant Riel's pecuniary gain is necessarily the same as the pecuniary gain to REinvest.

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the SEC's motion for summary judgment against Defendant Riel (Dkt. No. 24) is **GRANTED in part and DENIED in part**;[10] and the Court further

**ORDERS** that the SEC's motion for default judgment against Defendant REinvest (Dkt. No. 29) is **GRANTED**; and the Court further

**ORDERS** that Defendants Riel and REinvest are hereby jointly and severally liable to disgorge $197,500.00, plus prejudgment interest of $27,875.20; and the Court further

**ORDERS** that Defendant Riel shall pay a civil monetary penalty of $125,000.00; and the Court further

**ORDERS** that Defendants Riel and REinvest are hereby permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person; and the Court further

**ORDERS** that Defendants Riel and REinvest are hereby permanently restrained and enjoined from violating Section 17(a) of the Securities Act in the offer or sale of any security by

---

[10] The SEC's motion for summary judgment against Defendant Riel is denied only insofar as it was seeking judgment as to its control person liability claims.

use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) to employ any device, scheme, or artifice to defraud; (b) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in the SEC's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 27, 2017
Albany, New York

Mae A. D'Agostino
U.S. District Judge